**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| Anadarko E&P Onshore LLC, | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | Civil Action No. 4:25-cv-5250 |
| Maritech Resources, LLC, | § § | Jury Demanded |
| Tetra Technologies, Inc., | § § | |
| *Defendants*. | § § § | |

## ANADARKO E&P ONSHORE LLC'S ORIGINAL COMPLAINT

Plaintiff Anadarko E&P Onshore LLC ("**Anadarko**") files this Original Compliant against Defendants Maritech Resources, LLC (formerly Maritech Resources, Inc.) ("**Maritech**") and Tetra Technologies, Inc. ("**Tetra**"). Maritech and Tetra breached their contractual obligations and refused to indemnify Anadarko for costs Anadarko has incurred and will continue to incur in connection with decommissioning offshore oil and gas wells and related facilities located on certain leases in the Gulf of America (f/k/a the Gulf of Mexico).

### PARTIES

1.      Anadarko (formerly Anadarko E&P Company LP) is a limited liability company organized under Delaware law and has its principal office located in Houston, Texas.[1]

2.      Maritech is a limited liability company organized under Delaware law, has its principal office in Roanoke, Virginia, and may be served with process by serving its registered

---

[1] On January 1, 2013, Anadarko E&P Company LP converted to a limited liability company and changed its name to Anadarko E&P Onshore LLC.

- 1 -

agent in the State of Delaware, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

3.      Tetra is a Delaware corporation, has its principal office in The Woodlands, Texas, and may be served with process by serving its registered agent in the State of Texas, Capitol Corporate Services, Inc., 1501 South MoPac Expressway, Suite 220, Austin, Texas 78746.

## JURISDICTION AND VENUE

4.      This Court has federal question jurisdiction over this matter under 28 U.S.C. § 1331 and under 43 U.S.C. § 1349(b)(1) of the Outer Continental Shelf Lands Act ("**OCSLA**," 43 U.S.C. § 1331, *et. seq.*).

5.      This Court has personal jurisdiction over Maritech. Maritech regularly conducts business in this jurisdiction. Maritech had its principal place of business in The Woodlands, Texas from at least 2002 to 2018.

6.      This Court has personal jurisdiction over Tetra. Tetra regularly conducts business in this jurisdiction. Tetra has its principal place of business in The Woodlands, Texas.

7.      Venue is proper in this District under 28 U.S.C. § 1391(b) and under OCSLA, 43 U.S.C. § 1349(b)(1).

## FACTUAL BACKGROUND

### A. The Leases.

8.      At issue are two federal offshore oil and gas leases: (i) OCS-G 03170, Ship Shoal Block 290 ("**SS 290**") and (ii) OCS-G 02923, Ship Shoal Block 291 ("**SS 291**," and together with SS 290, the "**Leases**"). SS 290 covers all of Block 290, Ship Shoal Area, South Addition, as shown on OCS Official Lease Map, Louisiana Map No. 51. SS 291 covers the N/2 and SE/4 of Block 291, Ship Shoal Area, South Addition, as shown on OCS Official Lease Map No. 5A. The Leases

are located on the Outer Continental Shelf ("**OCS**"), offshore the State of Louisiana in the Gulf of America.

9.      Anadarko previously held an undivided ownership interest in the Leases. But, as discussed below, Anadarko transferred all its interest in the Leases to Maritech in 2004.

**B. The 2004 Anadarko-Maritech Transaction.**

10.     Effective January 1, 2004, Maritech acquired _all_ of Anadarko's interests in the Leases, and other assets, pursuant to that certain Purchase and Sale Agreement by and between Anadarko Petroleum Corporation and Anadarko E&P Company LP and Maritech, dated April 15, 2004 (the "**PSA**").

### i.    *Maritech Assumed All Obligations and Liabilities Relating to Decommissioning the Leases.*

11.     Under the PSA, Maritech assumed all obligations and liabilities of Anadarko with respect to the interests acquired, including all liability, costs, and expenses associated with plugging, abandonment, decommissioning, and site restoration for the Leases and associated wells, pipelines, platforms, and other related facilities.  In Section 2.1(b) of the PSA, Maritech expressly assumed:

> (i) All liability, costs and expenses associated with the plugging and abandonment of all Wells[2] and decommissioning and site restoration of all facilities associated with the [Leases];
>
> (ii) All liability, costs and expenses associated with the plugging, abandonment and/or removal of all pipelines, flowlines, and other related facilities associated with the [Leases]; and

---

[2] The term "Wells" as used in the PSA means "[a]ll right, title and interest of [Anadarko] in and to oil, gas, water or injection wells located on the Lands, whether producing, shut-in, or temporarily abandoned, including the interests in the wells shown on Exhibit A-1 attached" to the PSA.  As it relates to the Leases, Exhibit A-1 lists the following wells: (i) Ship Shoal 290 - A004, A017, A007, A014, A015, A006, A025, A021, A020, A018, A005, A013, and A023; and (ii) Ship Shoal 291 - A022, A019, A003, A001, A010 ST2, A024, A009, A016, A012, A011, B001, and A002.

(iii) All liability, costs and expenses for the continued operation of any existing Wells, platforms, pipelines and/or flowlines, and other facilities associated with the [Leases].

12.     Pursuant to Section 11.3 of the PSA, Maritech further assumed and agreed to:

fulfill, perform, pay and discharge (or cause to be fulfilled, performed, paid or discharged) all of the obligations and liabilities of [Anadarko], known or unknown, with respect to the [Leases], regardless of whether such obligations or liabilities arose prior to, on or after the Effective Time … including but not limited to … (iii) obligations to properly plug and abandon any and all Wells, including inactive Wells or temporarily abandoned Wells, drilled on the [Leases] or otherwise attributable to the [Leases], … (v) obligations to dismantle and remove any equipment structures, materials, platforms, flowlines, and property of whatever kind related to or associated with operations and activities conducted on the [Leases] or otherwise pursuant to the [Leases], (vi) obligations to clean up, restore and/or remediate the premises covered by or related to the [Leases] in accordance with applicable agreements and Laws,[3] and (vii) obligations applicable to or imposed on the lessee, owner, or operator under the Leases and related Contracts, or as required by applicable Laws (all of said obligations and liabilities, subject to the exclusions below, herein being referred to as the "**Assumed Seller Obligations**").

### ii.     *Maritech Agreed to Indemnify Anadarko Broadly Against All Claims Arising From Decommissioning Obligations.*

13.     Pursuant to Section 11.4(b) of the PSA, Maritech further agreed that it "shall be responsible for and indemnify, defend, release and hold harmless [Anadarko] from and against all Claims caused by, arising out of or resulting from the Assumed Seller Obligations . . . ." Section 11.4(a) broadly defines the term "Claims" as:

*all claims* (including, but not limited to, those for damage to property, bodily injury and death, personal injury, illness, disease, maintenance, cure, loss of parental and spousal consortium, wrongful death, loss of support, and wrongful termination of employment), *damages, liabilities, losses, demands, liens, encumbrances, fines, penalties, causes of action of any kind (including actions for indirect, consequential, punitive and exemplary damages), obligations, costs (including- payment of all reasonable attorneys' fees and costs of litigation), judgments,*

---

[3] The term "Laws" as used in the PSA means "all statutes, rules, regulations, ordinances, orders, and codes of Governmental Bodies." The term "Governmental Bodies" as used therein means "any federal, state, local, municipal, or other governments; any governmental, regulatory or administrative agency, commission, body or other authority exercising or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power; and any court or governmental tribunal."

*interest, and awards or amounts*, of any kind or character, whether under judicial proceedings, administrative proceedings, investigation by a Governmental Body or otherwise, or conditions in the premises of or attributable to any Person or Persons or any party or parties, breach of representation or warranty (expressed or implied), under any theory of tort, contract, breach of contract (including any Claims which arise by reason of indemnification or assumption of liability contained in other contracts entered into by an Indemnified Party hereunder), at law or in equity, under statute, or otherwise, *arising out of, or incident to or in connection with this Agreement or the ownership or operation of the [Leases]* . . . .

### iii.   *Tetra Agreed to Guaranty Performance of the PSA and Indemnify Anadarko Against Defendants' Breaches of the PSA.*

14.   The PSA also imposed these same obligations on Maritech's then-parent company, Tetra.  Pursuant to Section 7.12 of the PSA, Tetra executed that certain Corporate Guaranty, dated May 7, 2004 but effective January 1, 2004, in favor of Anadarko (the "**Guaranty**").

15.   Pursuant to the Guaranty, Tetra guaranteed Maritech's obligations under the PSA, including but not limited to plugging and abandonment operations on the Leases.  Section 1 of the Guaranty expressly states:

[Tetra], as a primary obligor, along with [Maritech], and not merely surety, hereby unconditionally and absolutely and irrevocably guarantees to [Anadarko] the prompt performance, when due, of any and all obligations of whatsoever nature of [Maritech] and of [Tetra], specified in the [PSA] (the "Obligations"), including without limiting the forgoing in any respect, the plugging and abandonment, site restoration, indemnification, insurance and defense obligations, and including any and all damages which may become due to [Anadarko] caused by failure of performance or payment by either [Maritech] or [Tetra] under the [PSA] or under the Guaranty. . . .

16.   The Guaranty expressly states that such obligations are "unconditional irrespective of: . . . (iii) whether or not [Anadarko] has failed to take any steps necessary to preserve its rights; (iv) the waiver of all or any obligations of either [Maritech], or [Tetra], by the [Anadarko]; (v) any failure by [Anadarko] to demand performance of the Obligations by [Maritech] or by [Tetra] . . . ."

17.   Section 9 of the Guaranty expressly states:

[Tetra] hereby agrees to pay on demand all damages caused by a failure of either [Maritech] or [Tetra] to perform the Obligations of [Maritech] and of [Tetra] under

the [PSA], and under this Guaranty, as well as all court and administrative costs and expenses and attorneys' fees paid by [Anadarko] in enforcing its rights against [Maritech] and [Tetra] under the [PSA] and under this Guaranty . . . .

### C. Maritech and Tetra Failed to Decommission the Leases.

18. Unbeknownst to Anadarko, SS 290 (Lease OCS-G 03170) terminated on May 31, 2007; therefore, decommissioning was initially required to be completed by May 31, 2008. Upon information and belief, on October 2, 2017, the United States Department of the Interior, Bureau of Safety and Environmental Enforcement ("**BSEE**") issued an Incident of Noncompliance ("**INC**") to Maritech for failure to decommission SS 290 and provided Maritech until August 31, 2018, to correct its noncompliance and perform the requisite decommissioning work. Upon further information and belief, because Maritech failed to meet the extended decommissioning deadline provided by BSEE, on October 21, 2020, BSEE ordered Maritech's co-lessees (which did not include Anadarko) to decommission SS 290 on or before June 30, 2021. Upon further information and belief, on October 7, 2021, BSEE issued INCs to Maritech's co-lessees and required SS 290 to be decommissioned by September 1, 2022.

19. Also unbeknownst to Anadarko, on or about October 10, 2008, but effective May 1, 2008, Maritech transferred all of its right, title, and interest in and to: (i) SS 291, (ii) all wells located on SS 291, and (iii) all wells located on SS 290 to Monforte Exploration, LLC ("**Monforte**").

20. SS 291 (Lease OCS-G 02923) terminated on December 3, 2021; therefore, decommissioning was required to be completed by December 3, 2022. Upon information and belief, on January 25, 2023, following Monforte's failure to decommission SS 291, BSEE issued an INC to Monforte for failing to decommission SS 291.

21. Upon information and belief, between July 2014 and May 2017, the Bureau of Ocean Energy Management ("**BOEM**") approved Monforte's request to transfer eight wells

(A004, A005, A007, A014, A017, A021, A020, and A025) from SS 290 (OCS-G 03170) to Lease OCS-G 32207, Ship Shoal Block 290 (the "**Transferred Wells**").  Upon further information and belief, in an order dated September 9, 2019, BSEE ordered the permanent plugging of Wells A014, A017, and A021 by December 31, 2020.  Upon further information and belief, in an order dated August 2, 2023, BSEE ordered the permanent plugging of Wells A004, A007, and A025 to commence on or before October 31, 2023.  Upon further information and belief, Lease OCS-G 32207 was relinquished on August 1, 2024; therefore, decommissioning of Lease OCS-G 32207, including Wells A005 and A20, was required to be completed by August 1, 2025.

22.    To date, neither the Leases nor the Transferred Wells have been fully decommissioned or permanently plugged, and neither Maritech nor Tetra have contributed in any way towards the decommissioning work that has been done.  Because Anadarko no longer held any interest in the Leases or the Transferred Wells at the time of their respective termination or ordered plugging, it did not know nor could it have reasonably known that the Leases had terminated or that Maritech and/or Monforte had failed to perform the requisite decommissioning/plugging activities.

**D.  Anadarko is Ordered to Decommission the Leases.**

23.    Beginning in October 2021, Anadarko received a series of decommissioning orders from BSEE related to Leases and the Transferred Wells, including: (i) Decommissioning Order dated October 7, 2021, related to Lease OCS-G 03170, SS 290; (ii) Decommissioning Order dated January 25, 2023, related to Lease OCS-G 02923, SS 291, (iii) Plugging Order dated October 12, 2023, related to Transferred Wells A014, A017, and A021; (iv) Plugging Order dated November 13, 2023, related to Transferred Wells A004, A007, and A025; and (v) Decommissioning Order dated August 13, 2024, related to Lease OCS-G 32207 and OCS-G 03170 and Transferred Wells A005 and A020  (each an "**Order**" and collectively, the "**Orders**").

24.     The Orders notified Anadarko—for the first time—of Maritech's failure to decommission SS 290 and of a similar default by Monforte to decommission SS 291 and permanently plug the Transferred Wells.

25.     The Orders required Anadarko and other former-lessees/operators to decommission the Leases and otherwise permanently plug and abandon the Transferred Wells.

### E.  Anadarko Demands Defense and Indemnity from Maritech and Tetra.

26.     On October 20, 2021, Anadarko made a demand on Maritech for defense and indemnity in connection with the Order related to SS 290.

27.     In its November 17, 2021 response, Maritech acknowledged its obligations with respect to SS 290, stating: "should Monforte, as current owner and operator of the liabilities, fail to complete its obligations, this email is to inform Anadarko that BSEE's Order does fall within the obligations assumed by Maritech in accordance with the terms of the PSA."  Maritech also indicated that because certain wells associated with SS 290 had a surface location on the SS 291 "A" platform (located on SS 291), Monforte's permission to access the SS 291 "A" platform was required in order to conduct the necessary decommissioning work.  According to Maritech, Monforte "has refused to allow access to any of the prior co-owners to the SS 291 'A' platform because it is currently unsafe to board."  Maritech assured Anadarko that "Monforte will be monitoring, permitting and completing the final abandonments for the five (5) wells associated with SS 290 Lease no later than March 31, 2022."[4]

28.     On August 7, 2023, Anadarko made a demand on Maritech for defense and indemnity in connection with the Order related to SS 291.  Although Maritech never directly

---

[4] Following the re-assignment of the Transferred Wells from SS 290 (OCS-G 03170) to Lease OCS-G 32207, upon information and belief, Wells A006, A013, A015, A018, and A023 remained associated with SS 290.

responded to Anadarko's SS 291 indemnity demand, Maritech subsequently acknowledged that Maritech's share of any performance bond applicable to SS 291 would "be paid to Anadarko as reimbursement for abandonment expenses paid by Anadarko toward Maritech's share of the decommissioning costs as a prior owner."

29.     Despite these reassurances and following Monforte's initiation of Chapter 7 bankruptcy proceedings in May 2024, on July 24, 2024, Maritech notified Anadarko that it lacked the ability to pay its share of the cost to decommission both SS 290 and SS 291.

30.     Beginning on March 20, 2024, Anadarko also began demanding Tetra perform its obligations under the Guaranty with respect to decommissioning the Leases and to fulfill its indemnity obligations.  To date, Tetra has refused to acknowledge or perform its obligations under the Guaranty.

**F.  Anadarko Enters into the Decommissioning Agreement.**

31.     Unable to rely on Maritech or Tetra to comply with their contractual obligations and in compliance with the Orders, Anadarko, along with certain other current/former-lessees/operators of SS 290 and SS 291, entered into that certain Decommissioning Agreement dated effective July 19, 2024 (the "**Decommissioning Agreement**").  Under the Decommissioning Agreement, Anadarko, as Maritech's direct predecessor-in-title under the Leases, agreed to contribute Maritech's proportionate share (29.87354%) of the abandonment and decommissioning costs for the Leases, including the Transferred Wells, so that the decommissioning work could proceed as required by the Orders.  As of October 27, 2025, Anadarko has paid more than $11.5 million towards the decommissioning of the Leases, including the Transferred Wells, and expects Maritech's proportionate share of total decommissioning costs to exceed $29.5 million.

32.     All conditions precedent to Anadarko's claims for relief have been performed, have occurred, or have been satisfied.

CAUSES OF ACTION

A.  Count 1—Breach of Contract Against Maritech

33.     Anadarko incorporates the allegations above.

34.     The PSA is a valid and binding contract to which Maritech is bound.

35.     Anadarko performed its part of the PSA.

36.     Under Sections 2.1(b) and 11.3 of the PSA, Maritech undertook an obligation to decommission the Leases, including the Transferred Wells.

37.     By failing to comply with the Orders, the Leases, Anadarko's demands, and other applicable regulations requiring decommissioning of the Leases and the plugging of the Transferred Wells, Maritech has materially breached its obligations in Sections 2.1(b) and 11.3 of the PSA.

38.     Moreover, the Orders constitute "Claims" under Section 11.4(a). Likewise, Anadarko's claim for reimbursement associated with damages, losses, and costs it has incurred in complying with the Orders constitutes a "Claim" under Section 11.4(a). Anadarko is entitled to indemnity from Maritech under Section 11.4(b) associated with the cost to decommission the Leases, permanently plug the Transferred Wells, and otherwise satisfy and/or comply with the Orders. By failing to indemnify Anadarko, Maritech has materially breached its obligations in Section 11.4 of the PSA.

39.     As a proximate result of Maritech's breaches, Anadarko has suffered damages in excess of $11.5 million and expects to further incur damages exceeding $29.5 million.

40.     Maritech is liable to Anadarko for damages, pursuant to La. Civ. Code art. 1994, which provides that: "An obligor is liable for the damages caused by his failure to perform a conventional obligation. A failure to perform results from nonperformance, defective performance, or delay in performance."

41. In addition, Maritech is liable to Anadarko for "all reasonable attorneys' fees and costs of litigation" and all other damages, liabilities, losses, obligations, and costs as set forth in the definition of "Claims" in Section 11.4(a) of the PSA incurred in connection with the Orders and Maritech's breach of its obligations under the PSA.

**B. Count 2—Breach of Contract Against Tetra**

42. Anadarko incorporates the allegations above.

43. The Guaranty is a valid and binding contract to which Tetra is bound.

44. Anadarko performed its part of the Guaranty.

45. Under Sections 1 and 9 of the Guaranty, Tetra undertook an obligation to decommission the Leases, permanently plug the Transferred Wells, and ensure performance of all Maritech's obligations under the PSA, including those in Sections 2.1(b), 11.3, and 11.4(b) of the PSA.

46. Tetra materially breached and continues to materially breach Sections 1 and 9 of the Guaranty by not fulfilling Maritech's decommissioning obligations and by failing to indemnify Anadarko for the costs it has incurred and will continue to incur in decommissioning the Leases and plugging the Transferred Wells.

47. As a proximate cause of Tetra's breaches, Anadarko has suffered damages in excess of $11.5 million and expects to further incur damages exceeding $29.5 million.

48. Tetra is liable to Anadarko for damages, pursuant to La. Civ. Code art. 1994, which provides that: "An obligor is liable for the damages caused by his failure to perform a conventional obligation. A failure to perform results from nonperformance, defective performance, or delay in performance."

49. In addition, Tetra is liable to Anadarko for "all court and administrative costs and expenses and attorneys' fees" as set forth in Section 9 of the Guaranty and all other damages,

liabilities, losses, obligations, and costs as set forth in the definition of "Claims" in Section 11.4(a) of the PSA incurred in connection with the Orders and Tetra's breach of its obligations under the Guaranty and PSA.

## JURY DEMAND

50.    Anadarko demands a jury trial.

## REQUEST FOR RELIEF

51.    Anadarko asks that the Court award final judgment in favor of Anadarko and against Maritech and Tetra including:

    a.   Actual damages;

    b.   Reasonable and necessary attorneys' fees, as permitted by the PSA and the Guaranty, and

    c.   All other and further relief, legal and equitable, to which Anadarko is entitled.

- 13 -

Dated: November 3, 2025

Respectfully submitted,

**NORTON ROSE FULBRIGHT US LLP**

/s/  Melanie Rother

Melanie Rother
*Attorney-in-charge*
State Bar No. 24041826
Federal ID No. 39164
melanie.rother@nortonrosefulbright.com
William A. Moss
State Bar No. 24078041
Federal ID No. 2522940
william.moss@nortonrosefulbright.com
Madeline Inzenga
State Bar No. 24131407
Federal ID No. 3850898
madeline.inzenga@nortonrosefulbright.com
1550 Lamar St Ste 2000
Houston, TX 77010
Telephone:     (713) 651-5151
Facsimile:     (713) 651-5246

***Counsel for Plaintiff Anadarko E&P Onshore LLC***